Aces 18-2090 and 18-2149, Lawrence Kosa et al. v. Intl Union United Automobile, Aerospace and Agricultural Implement Workers of America et al. Argument not to exceed 15 minutes for the plaintiffs and 15 minutes to be shared by defendants. Mr. Myers, you may proceed with the appellants when ready. Good morning, Your Honors. I'd like to reserve four minutes. My name is Ken Myers. I'm here on behalf of the plaintiff's appellants who are 156 current and former workers of both GM and a spin-off company called ACC, Automotive Component Carriers. And this case stretches all the way back, the first contract in this case goes all the way back to 1996. And some of the employees started working for GM as far back as 1976. And what happened in a sort of broad scale in this case is that over the years... Counsel, I hate to interrupt you, but did you say, you may have and I missed it, how much time you wanted to... Yes, four minutes. Thank you. I'm sorry. That's okay. Anyway... You were saying over the years... GM and the UAW built in protections in a series of contracts over the years that would protect these particular workers. There's two categories of them. The older ones, the ones that worked for GM, were known as the red dots. I don't even know how that came about, but that's what they were called. And then the group that started with ACC but had a similar but a little lower level of protection that were known as the yellow dots. They didn't have flow back rights, right? Well, that's a question. I mean, there's one document... Maybe I'll ask it specifically. They didn't have flow back rights under the 1996 MOU because they didn't even exist. That's correct, Your Honor. And then what, other than the 2009 SAP, what else was GM a party to that would give them flow back rights vis-a-vis GM only? The 2004 transportation agreement between GM and ACC, which basically incorporated the red dots... Because the UAW wasn't a party to it. Well, I think, and I've argued in my brief, that that's sort of a technicality because the UAW was a non-party officially, but they were overlooking it, they approved it, the local chairman said that, you know... So courts can go behind agreements and see how involved a union is in protecting its workers to determine if a 301 claim can be brought? I think in this case, I mean, this case is sort of unusual because... Do you have any authority for that proposition, that courts can dive into agreements and see how involved the union is in protecting its workers? Well, other than the basic principle that where a contract is ambiguous, you can use parole evidence. But it's not ambiguous as to who the parties are. It seems pretty clear to me. Well, on the face of it, that's correct, but then the UAW steps in and says, this is what we did for you. But if it's clear on the face, I'm sorry, how do we, and I'm sorry to keep interrupting you, but how do we dive into ambiguity? If it's clear on its face, I thought that's the end. Well, I think it would have been except that when the UAW steps in and takes credit for it and says, we were doing this, we were involved, but we weren't signatories to it, and this is what we got you. We got you five years of... That's what the UAW should be doing, even, we don't want to discourage the UAW from doing what they should, even when they're not signatories, they should be involved. That's what union workers want everywhere, is an active union. Well, I agree, but they should have... Should they have signed the agreement? Pardon? Should they have signed the agreement? I mean, because I don't think union workers want that. I don't know if you can get it all and not sign the agreement and so have... Let's say you get a bunch of commitments, but there's nothing that you have to reciprocate on. It seems like the best of all worlds. Well, it turns out it wasn't, though, because they then turned around and said it had sort of plausible deniability. You know, we didn't... Now they're saying it isn't a labor agreement because we didn't sign it. At the time, they were inserting themselves in it and saying, yes, we were. But let's assume even that you're correct that it wasn't... That the 2004 agreement wasn't a labor agreement. The yellow dots, Judge Duggan said that what they had looked like flowback rights, but that term is ambiguous, so I won't belabor what it's meant by that. What they had was they had certain rights pursuant to the 2007 agreement, Appendix A, that basically put them in the hierarchy, in the pecking order for hiring into GM jobs. But not vis-a-vis GM, right? Yes. In which one, in 2007? In the 2007 CBA between the UAW and GM, Appendix A writes in ACC, Guide, and Delphi as these spin-off companies that had return rights, basically. Even though they had not worked there before, they basically said, here's the pecking order in which we bring people in. And the yellow dots were considered laid-off employees along with all these other spin-off employees. So they were supposed to be brought in on a one-to-one basis based on seniority, which the yellow dot seniority went all the way back to 1997, because it said the longest unbroken ACC seniority. So basically the red dots had a superior position, and they should have been amongst the first to be hired in 2009. But the yellow dots had some level of protection, whether you call it fallback rights or not. And you're saying they had an actual right based on this 2007 agreement? Yes. The Appendix A of the 2007 agreement, which I've cited at pages, I think, 9 and 10 of my third brief, and which is part of the record below, specifically lays out this hierarchy. And the red dots are almost at the top of it because they were former GM employees. They had this close plant agreement, which gave them an enhancement. So once the rehiring was going on in 2009, bringing people back, the red dots should have been way up at the top. The yellow dots should have been mingled in with all these other Delphi and Guide employees pursuant to Appendix A of the 2007 CBA. So you have all these protections built in contractually. In fact, Mike Grimes, the vice president of UAW, testified in his deposition that he added that provision in Appendix A. Was it 2007 or 2011? Because this page cites the Appendix A to 2011. Am I missing something? The 2011 Appendix A is basically the same as the 2007 one, but the one that's relevant to our case is 2007. It's the same one. But anyway, Mr. Grimes testified that he added that to protect the ACC employees, especially the yellow dots. When 2009 came around, I think the basic premise was that GM was trying to shed debt during the auto crisis. So they wanted to get rid of this $25 million subsidy to ACC. So that affected all of these plaintiffs. But the point is they shouldn't have just gotten rid of them. They should have brought them into GM ahead of some of the other people they were rehiring at a huge pace. You know, $13,000 within a year and a half of the bankruptcy. And so when that didn't happen, that gave rise to both our claim against GM for violating the contract and the DFR, the duty of fair representation claim against UAW. What happened was they constructed this 2009 SAP, which they asked everyone to sign, which didn't include any provisions for either flowing back for the red dots or for coming back in their pecking order under Appendix A for the yellow dots. So there are several contracts that were violated. And this case took kind of a weird procedural path because different defendants and different plaintiffs were kind of shed at various times over the years under both dismissal and summary judgment. And then another summary judgment. And, again, I think that the red dots have a better claim because they had specific contractual flowback rights. And they were told during the critical period in 2009, A, you don't have flowback rights. B, you have to retire or else you'll lose everything. And C, you'll never see the inside of a GM plant. So there's no sense in trying to get back to GM because there's no jobs. And so those. Sorry. That's not the claim against GM then. You're moving to the claim against the UAW. Correct. Well, the claim against. You're correct, Your Honor. The claim against GM is that they were supposed to both offer the jobs and were supposed to have a communication plan to tell the employees how they were supposed to access it. 2009 SAP. Correct. And then when you moved to the union, I mean, at the time the union made that statement, was it wholly irrational? I mean, wasn't GM going through a bankruptcy? Didn't we all have to bail them out? I mean, it seems like if I'm looking at it at that time, I'm thinking there's no way you're seeing the inside of a GM plant. Well, first of all, I don't know that that's the union's place to tell them. The union's place is to tell them here's what your rights are. The union should be candid with them, right? And if they think, geez, this is a fool's errand because GM's going through bankruptcy and we're not going to be getting people jobs, they're laying people off, not bringing people in. Well, except that that wasn't true. And as we found out when we finally got the spreadsheets that showed they were doing massive hiring and rehiring. Now, they'll argue, they have argued that, well, we weren't hiring anyone new, but they were bringing back people. But they would have seniority anyways. They would. That's part of the whole point is the red dots had the... But they wouldn't have seniority. I'm sorry to interrupt you, but am I wrong in thinking that layoffs at GM would have seniority over red dots? No, because the red dots were considered layoffs from GM under the 2007 Appendix A, but they also had another enhancement, which was this closed plant status. If you're deemed to come from a closed plant, you are deemed to have a higher level of priority to get back. So the red dots, by virtue of... And employees, they just laid off. Yes. Yes, because the plant... It wasn't just that they laid them off, it's that the plant closed under them. And so Arthur Schwartz, the GM labor guy, wrote this memo that said we're giving the red dots a boost, basically. We're considering that they come from a closed plant. So they should have had a higher priority. Meantime, the union's telling them, no, no, no, you've got to retire, when they knew or should have known that they had almost top priority for rehire at GM and that GM was hiring like crazy or rehiring like crazy. What is your burden? And I see your time's running out, but let me ask you this. What is your burden on that claim? Do you have to prove that these individuals essentially would have received jobs at GM someday? I mean, is that they would have been told the right things, would have applied, would have gotten the right priority, and then would have gotten a job? I've argued that the would have gotten a job part of it and when and where is a damages issue. But the reality is... Doesn't it have to be a causation issue as well? Well, yes. I get that there's a damages component to it, but it seems to me it has to be a causation issue. Well, the question of when and where they would have gotten a job, so in other words, if they're only waiting a week as opposed to a month, I think that's a damages issue. But it's clear... Fair point, but whether they would have. Right, and they've all signed, most of them signed affidavits, which the district judge kind of disregarded as form, but they're evidence. And these guys, the ones that did give depositions, testified that they weren't ready to retire and that they were scared into retiring. One of them was only 49 years old and he had another 10, 15 years to go. But most of them, I think just about all of them signed affidavits, which basically said if I hadn't been told X, I wouldn't have retired, I would have done whatever I had to do, jumped through whatever hoops. So I would have taken the huge pay cut, remained in place... For like a week. And then whatever would have happened would have happened, and eventually I would have gotten... They probably wouldn't have even gone to the plant at the lower wage because the other thing we've argued is that several sort of favored individuals did walk right into a plant at the higher wage level. That didn't take... That took the retirement, but they still walked into the plant because they knew somebody that knew somebody and they knew they were hiring. So there's just a lot of unfairness about this whole thing. I'll come back. I'll have your full time. Thank you. Council, before you start, can you let me know how you're splitting your time? Yes, I'm representing GM. I'm going to take five minutes to address the contract issue and the motion to amend the third amended complaint motion. And then Mr. Nikoloff is going to handle the claims that are more discreet against the UAW. Okay. Thank you. It pleases the Court. I'm Kim Ebert, representing General Motors. The issue that we think is important to understand here is that for purposes of liability in the hybrid 301 case, you have to have a collective bargaining agreement and there has to be a demonstration that the employer has breached that collective bargaining agreement. As your questioning had suggested, there's really only two collective bargaining agreements here, as found by the judges below. There's the 1996 Memorandum of Understanding that was entered into after GM and ACC set up their new arrangement. That collective bargaining agreement did give the red dots, the people who were going to be moving from GM to ACC employment, did give them a one-year period of time where they could flow back to GM. Keep in mind, the ACC employers are truck drivers, and they'd be flowing back into factory jobs, so no one applied to do that flow back. And then ultimately with the crisis that occurred with GM, the financial crisis, there was negotiated the SAP in 2009, which again was a collective bargaining agreement. What about this 2007 agreement and the appendix? Well, I think that's a new argument, but the fact of the matter is that if he's talking about the yellow dots under the 2007 agreement. I'm sorry, and I changed from red to yellow. No, that's okay. What he also mentioned was that they were going to be hired back on a one-to-one ratio with new hires, which means they are the absolute bottom tier of anyone in the system. While you're on tiers, can you explain where do the red dots fall vis-à-vis layoffs? It's important to understand that back in 1996 and perhaps before 1996, GM and the UAW negotiated Appendix A. Appendix A has a very complicated formula for determining who goes where. You have tens of thousands of employees who are being let go, plants are closing, and then you have dozens and dozens of plants. So how do we match up these people that are being let go with the vacancies that exist? They set up a system where the employees who are being impacted by whatever is going on have to file an application indicating that they're interested in relocating, what plant they're interested in relocating to. And then once those applications are in the system, the people that are doing air traffic control on all of this movement of personnel determine where they fall in this very complicated regimen of placement. It's important, overarching for this case, none of the plaintiffs filed any applications except for, I think, 14 red dots. So all the yellow dots, no applications. The vast majority of the red dots, no application. Now, Mr. Myers argues that that's a technicality and the GM is playing gotcha and that it's a red herring. The fact of the matter is that's a fundamental requirement for them to be considered for flowing back. And until they flow, until they go back. What about the 14? The 14, as Judge Cleland went through in very thorough detail, demonstrated that seven or eight of them had not designated a plant that they wanted to return to, so their applications were flawed. Another three or four were designated in an area that they couldn't demonstrate that they had. But doesn't that seem, I mean, it seems like a little bit of gotcha. Like, they filed these things under the 2009 SAP. I think GM had communication obligations that, I mean, it's a close call whether they fulfilled that requirement. And, I mean, they filed these things. Why shouldn't GM ask that question? Like, where are you, what plant? I don't think we had a contractual obligation to reach out to employees to make that inquiry. The fact of the matter is that two individuals in the red DAT category made proper applications and then were moved back into vacancies. They were allowed to flow back. So it shows that GM was following the system that had been put in place. If they did it right, are they the highest priority? No. There's a whole hierarchy of priority. People who were laid off from a particular plant were at the top of the list. Here you have ACC people trying to move into plants that they'd never worked in. And so what Mr. Myers is arguing is they, these red dots and the yellow dots, should be able to jump the line ahead of people who had proper applications in and were higher ranking under the Appendix A protocol. So that, in fact, would have caused GM to have violated the contractual rights of those people who had proper applications in the system. And was all that analysis was done in the context of evaluating the motion to amend? It was. Because he's looking at it. Correct. Usually you were out before there was any evidence. Right, right. So we're talking about these 14 and he's looking at evidence. But there are two aspects to that. And one was failure of Mr. Myers to act with due diligence to try to figure out, you know, whether he had any claims. Because, remember, this is not a class action. These are individual claims by individuals. They have to designate, point out somebody who got preferential treatment ahead of them. And he's not done that. But that also pertains to the claim as it applies to the UAW because they would have no, he wouldn't be able to meet whatever burden is to establish that. Judge Cleland, we had done it in our brief, but Judge Cleland took a lot of time to really drill down on that, to demonstrate that nobody had been harmed even if they had filed proper obligations. Okay. Thank you, counsel. Thank you. Good morning. Andrew Nicholhoff on behalf of the UAW International Union and its local 659. I need to correct a mischaracterization of the record by the appellant's counsel. There was a 2007 collective bargaining agreement between GM and the UAW. It didn't cover ACC. And that continued forward Appendix A, which had been in contracts for years, which was this order of precedence that's laid out on page 19 of our brief. So then is it true that yellow dots were the equivalent of hires off the street or did they get some kind of preferential treatment to hires off the street? They did at the 11th hour and the 59th minute. At that time, GM, and it was unilaterally, said, and it was from Arthur Schwartz, who was their labor relations director, in an e-mail. It wasn't a negotiated agreement. It was sort of a gratuity from GM, said, we'll give laid off ACC employees or ACC employees closed plant status under this. Closed plant status is not the highest status, but it's relatively higher. It's better than what they would have had, which would have been at the bottom. Are they current beneficiaries of this agreement? Well. You're saying the appendix, which gives them or which acknowledges their priority as low as it is, is part of the agreement between GM and the UAW in 2007. The appendix is, but this particular wrinkle on the appendix was done unilaterally by General Motors, and I think it was as a favor to ACC. What does the agreement say about the appendix? Well. We're attaching this appendix, incorporating it as part of this agreement. The real agreement here, the meaningful agreement, is the one back in 1996 when GM spun off ACC, and it was the Memorandum of Understanding. And Section 5A of that document said the transferred employees, that is, GM people who went over to ACC. The red dots. Right. The red dots could come back to the mothership through a flowback in accordance, if they filed applications and there was a deadline, which may or may not have actually applied. I think it was loosened. But only in accordance with Appendix A. In other words, they wouldn't jump over other actual GM employees. So why don't the four red dots have a legitimate fair representation claim then? Why don't the red dots? Yeah. Well, I mean, the duty of fair representation speaks in terms of arbitrary or discriminatory or bad faith conduct by a union. And as you raised, and I think legitimately so, in this context, and it has to be viewed in the context of what was going on at the time to determine whether a union was acting totally irrationally, which is the standard. So I think they were the group four red dots. Maybe I'm butchering that. But they filled out an application. They specify a plant. The plants end up hiring. Right. And they had at least high priority for those plants. So it seems to me that at least they should satisfy the causal chain. They would at least bring a claim past where they're at now. And that's addressed in the record. In other words, we have evidence that determines whether there were eight of them, actually, who designated plants. Four of them were area higher, which was the highest priority. And then another four were extended area, which was outside of Michigan, basically, or 50 miles. Okay. So there are eight of them who did designate plants and could have flown back to GM if they had not retired and instead stayed with ACC at half the wages and inferior benefits and not gotten the cash payouts and the car and all that kind of stuff. But are there affidavits in the record from them that say, oh, if I had known that, I would have stayed in? Yes. There are form affidavits. Why don't you go to a jury, then? Okay. And the reason is because the UAW did our homework. We got the records from General Motors. And in terms of what openings were available at the plants that those eight red dots named in their applications, and would there have been jobs that they would have qualified for? And the answer in every single case was no. And there's a flow chart. At what point in time? At the time they made the election? We covered the records. And if they had picked option three, or I can't remember which one it was. Option, right. I'll stay at the plant. I'll take the cut. Right. And you're saying we pulled the records and they wouldn't have been. I mean, not at that point. What about a year from then or six months? Or what if they say, hey, I would have hung out for a year and waited and seen. Okay. And that's a reasonable question. And we tried to do the reasonable thing. So we looked at openings in the GM data from June of 2009, at the time they were electing whether to stay or go, all the way through the end of 2010. So Mr. Myers says, well, they would have gotten jobs at GM in a couple of weeks or a couple of days or a couple of months. We looked all the way through the next year. And if you look, and I encourage you to look at Document 93-16, which was an exhibit, Exhibit 46, to our second motion for summary judgment. And it charts out for these eight red dots the plants that they designated and whether there were openings in those plants that they would have qualified for under Appendix A. And the answer in every single case was no. We did the homework. And in response to that, all that the plaintiffs can say is, well, there was this mass hiring spree and there were all these people and there were 14,000 new hires, all of which is unsupported in the record and has nothing to do with these eight individual plaintiffs, each of whom individually must make the case that they were injured in some manner, even assuming that the UAW breached its duty of fair representation, which, of course, we dispute. And the homework you did was carefully reviewed by Judge Cleland. It was. And, in fact, and it's laid out in our brief and it's laid out group by group in Judge Cleland's opinion granting summary judgment for the UAW. That's Record 110. And it's laid out in our brief as well. And this is really a, there is no way to defeat the facts that have been put into the record in this case. And the only argument and the only basis that the plaintiffs have is, A, this kind of smoke and mirrors allegation that there were all these openings, and, B, these form affidavits, which were totally self-serving and filed years after the case commenced, saying, oh, no, I would have opted to designate a plant where there was an opening. I would have been an area hire. Understand that at that time, in all of that chaos surrounding General Motors, they had just filed for Chapter 11 bankruptcy a month earlier. They were not telling anyone, the UAW or anyone else, which plants had openings and where people should designate for flowback or recall or anything like that. They were not telling that. In one case, they told the UAW, there are openings at a plant in Lansing. I don't want you to turn on them, but didn't they, under 2009, have responsibilities, the SAP, for communications? I mean, didn't they have to communicate this? It's a little unfair, it seems to me, to say, well, the employees didn't dot their I's and cross their T's when chaos is going on. Well, they did communicate in the sense that the letter that employees got explaining the SAP gave a lot of information. What they couldn't give is, you know, you should designate the Lansing axle plant or a particular plant. Why is that? They couldn't do that. In some part, the UAW's responsibility to find out and communicate. Well, because there was no contractual obligation on General Motors' part to do that. In other words, and they didn't do it. I believe that they didn't know, on a day-to-day basis, where openings were at that time. Because it was chaotic. And they were shedding subsidiaries left and right. They were moving and closing plants. These people who didn't specify, so not this group, but didn't specify, but no one knows where the openings are at this point. It seems a little harsh to me. I can understand that. But on the other hand, if you put liability on the UAW for not being omniscient or knowing something that no one else knew at the time, maybe not even GM day-to-day, that doesn't seem fair either. So in some ways, these employees could have taken a gamble and they could have stayed at ACC. They would have given up $20,000 in cash. They would have given up a $25,000 car voucher. They would have given up a General Motors pension and lifetime health insurance benefits, if they had done that. And there's a lot of testimony from those red dots. No way I was going to do that. I was going to take a sure thing. It's not a gamble to ask these guys. It is. It was a difficult situation for everyone, the UAW, these employees, and General Motors. And it was a historically unprecedented situation. And yet they have affidavits that say, yes, I would have done exactly that. Right. But having said that, what we can't do is unscramble the egg. In other words, they could say that, but what plant specifically would they have designated? And they could go back now with hindsight and with the data in terms of where the openings were and what employees were taken in and say, oh, yeah, sure, I would have designated that plant. That would have been my designation. But that's not fair either. You can't rewrite history and create a factual record on that basis. In addition, the test of whether a union has breached the duty of fair representation, those standards are relatively rigid. In all of these cases, there are things in hindsight that the union could have done better or didn't do better and whatnot, but the case law is such that they pretty much hold you to those standards. That's absolutely right. I mean, there is not a malpractice standard for unions for good reason. A union can do a lousy job, and I don't for a moment concede here that the UAW did, but a union theoretically can do a lousy job and still not breach the duty of fair representation. It has to go way beyond that. It has to be almost intentional in bad faith. Well, it does have to be, or at least so arbitrary that it can't be defended. Nothing like that happened here. Everyone was trying to stay afloat as best they could. Time's up. Thank you. Mr. Myers. Thank you, Your Honors. To answer Judge Guy's question, it is a fairly – the duty of fair representation standards do give the union a fair amount of discretion. What they can't do is they can't lie and they can't ignore valid claims, and there's evidence in the record that the chairman of the local, Rick Taldow, didn't even know what Appendix A was. He didn't even know some basic concepts of union leadership or of contract negotiation to be able to help these people. He didn't do anything for them. So I would argue that when you come in and you tell someone the exact opposite of what's happening and you don't know how to protect them because you don't know the basic contractual mechanisms, that violates the duty of fair representation. Mr. Nikoloff said that they did their homework and they checked to see that none of the red dots would have been hired. They didn't do that until this lawsuit. They never did it at the time. In fact, the 2009 SAP, as I've pointed out, says the red dots have flowback rights, but it didn't give them an option to flowback. None of the three options included flowback, and no one told them how do we access the flowback rights. All they were told was you better retire because otherwise you'll lose everything, and what they took that to mean was they'll lose their GM pensions. But didn't they assume that if they weren't employees anymore, they wouldn't have flowback rights, right? No. No, they didn't know. So they thought maybe I could take option one. Oh, I see what you're saying. I mean, they knew that they had to take option three. Right, they knew that by retiring that they were losing their flowback rights, but they were told specifically, they asked the question, what about our flowback rights? And they were told you don't have them. They don't exist. So that was, and then later during the depositions, I think it was Mike Grimes again or Hal Rapson, one of the other vice presidents, said, oh, yeah, they still had flowback rights, but no one told them how to get them. And the idea that they filed these. Was it just incompetence or there was something nefarious going on? Well, I think it bordered on both because maybe it started as incompetence, but then when some of the union leadership started grabbing the jobs that supposedly didn't exist, you know, walking into these jobs in Lansing for jobs that didn't exist. You know, Mr. Nikoloff says that they didn't know that these jobs were out there, but they're holding the plaintiffs to the standard of filling out on the application where they want to go and where a job exists when the union's claiming it didn't know. But the union has to know at a certain point because they have to sort of, at least for informational purposes, know who's being hired where, where their members are. And some of them may have been new members. So I think there's, you know, certainly questions of fact, at least as to the red dots, because a lot of it revolves around what were they told at the time in 2009 and what would they have done had they not been told these things. And I think those are jury questions. The other thing I would want to raise as far as what the attorney from GM talked about, as far as them being locked into the filing applications and having the direct locations listed, Appendix A, which I've cited at page 9 of my third brief, specifically says it's forward looking. Employees will be given the opportunity to designate from among those plants within their area hired. And then it says an employee will be allowed to change the plant so designated any time prior to a bona fide job offer. So these things weren't meant to be, you know, etched in stone where you fill out one application, one location, and you're bound by it. It was intended to be a flexible procedure where they could fill in where the jobs were. And they were even told when they filled out their initial application, some of the red dots, just put a placeholder in, just put like Arizona, because you can change it later, which is absolutely true. So in conclusion, I'd just ask the court to find that there were issues of material fact on the summary judgment issues, that there were issues that, if taken as true on the dismissal issues, should bring GM back in the case and reverse and remand on the issues that we've raised. Thank you. Thank you, counsel. Thank you all for your arguments. The case will be submitted. We appreciate your thoughtful arguments. Have a nice day.